RANDY S. GROSSMAN
United States Attorney
Sabrina L. Fève
California Bar No. 226590
Nicholas W. Pilchak
California Bar No. 331711
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT FICHIDZHYAN (7),<br><br>Defendant. | Case No.: 21-CR-2660-BAS<br><br>Date:   January 6, 2022<br>Time:   10:30 a.m.<br><br>The Honorable Cynthia Bashant<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

**TO:  Marcus Bourassa, Attorney for Defendant ROBERT FICHIDZHYAN (7)**

The UNITED STATES OF AMERICA, by and through its counsel, RANDY GROSSMAN, United States Attorney, and Sabrina L. Fève and Nicholas W. Pilchak, Assistant U.S. Attorneys, hereby files its Sentencing Memorandum.

## I.

## <u>INTRODUCTION</u>

Robert Fichidzhyan and his co-conspirators victimized a huge number of people by stealing their financial identities. They committed the crime for years, stealing hundreds of thousands of dollars from unwitting victims, and some of them—including Fichidzhyan himself—were not deterred by stiff penalties in prior convictions for almost exactly the same crime. Based on the seriousness of the offense and

Fichidzhyan's criminal history, after a modest departure to reflect his substantial health considerations, the United States recommends that he be sentenced to 46 months in custody, followed by three years of supervised release. The parties also jointly recommend forfeiture of $249,890.00 and restitution in the amount of $619,923.45.

## II.
## STATEMENT OF THE CASE

On September 9, 2021, a federal grand jury in the Southern District of California returned a six-count indictment alleging an access device fraud conspiracy and various counts of aggravated identity theft. Fichidzhyan was charged in Count 1 with conspiring to use unauthorized access devices and possess device-making equipment, in violation of 18 U.S.C. § 1029(b).

On May 18, 2022, Fichidzhyan pleaded guilty to Count 1.

## III.
## STATEMENT OF FACTS

**A.  Background: Credit card skimming & unauthorized access devices**

The charged conspiracy in this case involved a pervasive scheme of debit and credit card skimming and creating unauthorized access devices. Credit card skimmers are specialized devices created by identity thieves to steal the sensitive financial data exchanged by unwitting victims at a given point of sale. For example, a fraudster might insert a skimming device inside an ATM or a gas pump to steal the transaction data used by customers to complete their withdrawals or gas purchases. The skimming device will then store the stolen data until it is retrieved by the skimmer or his associate. With the stolen data in hand, a fraudster can encode a new (unauthorized) card bearing the victim's real information—account number, PIN number, etc.—and use that card to make purchases or withdraw cash.

**B.  Building skimmers**

In this case, Fichidzhyan's role in the prolific skimming conspiracy was to build skimming devices used by his co-conspirators to steal unwitting victims' financial

information. Fichidzhyan's fingerprints showed up on skimming devices recovered during the investigation and linked to his co-conspirators, as discussed in more detail below. Electronics supplier records show that Fichidzhyan ordered at least 14 separate shipments of the kinds of components used to build skimmers between July 2016 and July 2018 at his former residence. Thereafter, Fichidzhyan appears to have transitioned to using straw recipients or addresses to receive his supplies. Telephone toll records show that Fichidzhyan was in regular telephone contact with the conspirators installing the skimming devices during the period of the installations, suggesting that he actively provided technical support for his products.

C. <u>Using skimmers</u>

Agents began observing Haykaz Mansuryan (1) and Hayk Shakaryan (2) intensively installing and downloading from skimming devices at gas stations across Southern California in about September 2019. In particular, agents observed the two men using a black 2019 GMC Denali registered to Mansuryan's brother. Agents tracked the Denali as it visited a large number of gas stations in Southern California for skimmer installations and downloads. Later, agents began to observe Davit Babayan (3) accompanying Mansuryan on skimming hits.

Mansuryan and Shakaryan's fingerprints were found on some of the skimmers seized by law enforcement during this phase of the investigation. Significantly, other fingerprints and DNA evidence led investigators to individuals involved in building the devices, such as Fichidzhyan. For example, forensic agents found Fichidzhyan's fingerprints on a skimmer removed on September 11, 2019 from a gas station on Firestone Boulevard in South Gate, California. The device also bore Mansuryan's fingerprints. Subsequent DNA analysis linked Fichidzhyan to a second skimming device recovered July 21, 2020 from a Sinclair gas station at 10 Osborne Street in National City, California. Mansuryan was observed on surveillance at that location, which helped further link the coconspirators.

**D.      Laundering the proceeds**

The investigation also collected bank records for several of Fichidzhyan's financial accounts. As related in the PSR, his employment history is very limited, and his only stated income besides unemployment and disability benefits is $10 per hour for his parents' healthcare business. *See* PSR ¶¶ 82–84. At the same time, Fichidzhyan's principal bank account posted a total of approximately $307,602.00 in cash deposits for the period of available records, including $249,890.00 of cash deposits during the time Fichidzhyan was demonstrably involved in the charged conspiracy. The smaller amount was used as a conservative estimate of proceeds received by Fichidzhyan from his participation in the offense.

## IV.
## MEMORANDUM OF POINTS AND AUTHORITIES

**A.      Guidelines Calculations.**

*1.      Introduction*

The parties have agreed to jointly recommend the following guidelines calculations:

| | |
|---|---|
| Base offense level [USSG § 2B1.1(a)(2)] | 6 |
| Loss over $550,000 [USSG § 2B1.1(b)(1)(H)] | +14 |
| More than 10 victims [USSG § 2B1.1(b)(2)(A)(i)] | +2 |
| Sophisticated means [USSG § 2B1.1(b)(10) | +2 |
| Unauth. access devices [USSG § 2B1.1(b)(11)(B)] | +2 |
| Acceptance of responsibility [USSG § 3E1.1] | -3 |
| Physical condition [USSG § 5H1.4] | -2 |

Based on the parties' plea agreement, and for the reasons set out below, the Court should follow these recommended guidelines. Given the seriousness of the offense, the Court should decline to depart further.

### 2.   *The loss amount is $573,649.20.*

In his plea agreement, Fichidzhyan admitted that the conspiracy inflicted losses of at least $573,649.20 during the period that he was directly involved in it. These losses were tallied by adding up the losses from victims whose accounts were compromised by the skimming conspiracy, after the government can prove that Fichidzhyan joined the conspiracy. Fichidzhyan was not held responsible for losses that arouse prior to his involvement. At the time the parties negotiated the plea agreement, the date Fichidzhyan was first tied to the conspiracy was September 11, 2019, which is when a skimmer containing fingerprints for Fichidzhyan and Mansuryan was recovered from a California gas station.

### 3.   *Victims in this case are too numerous to count.*

The Sentencing Guidelines provide a two-level enhancement for a fraud scheme that victimizes more than ten people. USSG § 2B1.1(b)(2)(A)(i). While the "victims" counted for purposes of this adjustment include the card-issuing financial institutions that suffered actual financial losses when they reimbursed their accountholders for amounts stolen by Fichidzhyan's accomplices, the calculation for the number of victims also includes the individual victims. That is because, for access device fraud cases, the guidelines expressly include individuals whose identifying information was stolen—even if they suffered no pecuniary harm. *See* USSG § 2B1.1 cmt. n. 4(E).

In this case, agents and investigative staff have been unable to quantify the number of victims because they are too numerous to count, and reconstructing an accurate number (let alone identifying them individually) would swamp the available investigative resources.[1] *See* ECF 111. It is undisputed, however, that there were more than ten victims in this case. The two-level adjustment is therefore properly applied.

---

[1]   Calculating the number of victims is difficult and time-consuming, as it requires comparing card numbers across hundreds of transactions and then attempting to trace card numbers to individual victims, which often requires multiple rounds of subpoenas and many hours of analysis by bank staff and investigating agents.

### 4. *Sophisticated means.*

The guidelines provide a two-level enhancement for a fraud scheme that involves sophisticated means, as long as the defendant engaged in or caused the relevant conduct. USSG § 2B1.1(b)(10)(C). Here, Fichidzhyan custom-built specialized skimming devices installed inside gas pumps to surreptitiously steal victims' financial information during otherwise legitimate transactions. It appears that many of the devices had Bluetooth technology so that, once installed, they could be downloaded by a co-conspirator in the vicinity of the gas pump without the risk of opening the pump itself to access the physical device. This technical sophistication and know-how warrants application of this enhancement.

### 5. *Physical condition.*

Finally, the parties jointly recommend a two-level reduction based on defendant's extraordinary physical condition and its associated challenges and impact on his life. *See* PSR ¶¶ 66–70.

## B. The Sentencing Factors.

### 1. *The need for punishment and to reflect the seriousness of the offense.*

Credit and debit card fraud is a serious problem, constituting a billion-dollar crime that victimizes a significant proportion of the population and the financial system. Victims have almost no means to defend themselves from a well-planted credit card skimmer. While victims are typically reimbursed by their banks after the fraud is discovered, changing accounts and reordering their financial lives after an identity theft can be difficult, time-consuming, and frustrating. It can also lead to knock-on effects if it affects victims' ability to meet their own financial obligations after having their financial identity stolen and their account tapped. And of course, the burden on the financial system includes not just financial losses but personnel and remediation costs in detecting and guarding against the frauds.

The offense in this case was serious and victimized many people. Fichidzhyan's role in the scheme was important: he built and supplied the sophisticated technical

hardware that made the crime possible. And while the investigation suggests that Fichidzhyan may not have been the main supplier of skimming equipment during the conspiracy, he was an integral part of its functioning. He also seems to have profited handsomely from his role, admitting that he personally obtained almost a quarter of a million dollars of fraud proceeds.

This substantial and persistent crime deserves a serious punishment. And Fichidzhyan's own case shows why such a significant punishment is warranted. Fichidzhyan and his coconspirators comprised an effective and persistent ring of access device fraudsters, perpetrating the entire life cycle of the crime: building customized and effective skimming devices, installing them repeatedly at dozens of points of purchase, skimming victims' personal information, selling the stolen identities and/or encoding bogus cards with the stolen information, using the bogus cards to withdraw cash, and then laundering that money through the financial system. The nature and circumstances of the offense itself accordingly warrant serious punishment.

### 2. *The need for deterrence and to promote respect for the law.*

The Court must also consider whether the sentence it fashions will promote deterrence and respect for the law. Fichidzhyan's personal history shows why a substantial sentence is needed to prevent fraudsters from returning to this means of making a living. Fichidzhyan has credit card fraud and identity theft-related convictions going back to 2002, when he was only 19. He suffered a serious federal conviction for extremely similar conduct in 2010 in Utah when Fichidzhyan and another individual were convicted of skimming victims' financial information at gas pumps. In 11 days, they stole 4,052 credit card numbers. PSR ¶ 46. In fact, Fichidzhyan was on state probation for a credit card fraud offense when he was building skimmers for the instant conspiracy. PSR ¶¶ 47, 49. None of these convictions—including the 30-month sentence he received for his prior federal conviction—dissuaded Fichidzhyan from making his living via fraud. A substantial sentence in this case is necessary not only to

reflect the seriousness of the offense but also to finally and specifically deter Fichidzhyan from returning to this lucrative career.

Such a sentence is also necessary to promote respect for the law and to generally deter others from participating in this offense. As discussed above, the financial system is vulnerable to this crime because moderately capable perpetrators can compromise many points of sale (like gas pumps) that unwitting victims simply cannot avoid. With the resulting stolen data, criminals have access to millions of dollars of victim assets in very short order. Because the scheme is so profitable, it will inevitably be tempting to potential offenders to substitute honest work for modest wages with a few hours of criminal fraud to reap easy money. Hence the need for a meaningful sentence to deter others considering the same crime.

C. **Forfeiture.**

Fichidzhyan admitted in his plea agreement that he personally obtained at least $249,890.00 in proceeds during the conspiracy. Forfeiture of this amount is mandatory under 18 U.S.C. § 982(a)(1), and the parties have agreed to jointly recommend it. The Court has already entered a forfeiture order, ECF 168, and the United States simply requests that the Court pronounce forfeiture orally at sentencing and incorporate it into the written judgment.

D. **Restitution.**

Restitution is mandatory for this offense. 18 U.S.C. §§ 3663A(a)(1). In his plea agreement, Fichidzhyan admitted that his conspiracy inflicted actual losses on its victims in the amount of $573,649.20. This amount was calculated by aggregating victim losses from points of purchase compromised by the conspiracy. Following the parties' agreement in principle, agents identified additional losses inflicted by the conspiracy during the period of Fichidzhyan's involvement, which brought the total losses to $619,923.45. Although Fichidzhyan should receive the benefit of his bargain in loss guidelines calculated on the lower figure, the more accurate (and higher figure) must be used to calculate mandatory restitution. Indeed, the parties have agreed to

jointly recommend that Fichidzhyan be ordered to pay $619,923.45 in restitution, jointly and severally with his codefendants, to the financial institutions that bore the loss.

The United States will submit separately a proposed restitution order, and respectfully requests that the Court find in its restitution order that further individualized restitution to individual victims and financial institutions is impracticable due to the number of victims and the complexity of factual issues in quantifying their individual losses under 18 U.S.C. § 3663A(c)(3).[2]

## V.
## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court impose a sentence of 46 months in custody to be followed by three years of supervised release. The parties also jointly recommend forfeiture of $249,890.00 and

//
//
//
//

---

[2] Identifying individual victims is extraordinarily difficult for crimes like this one. Investigating agents have made diligent inquiry into the losses in this case, but quantifying them and tying them to victims has been prohibitively difficult. Identifying individual victims and their financial institutions requires agents to (1) retrieve full financial information (such as purchasing card numbers), (2) identify the financial institutions associated with each individual compromised card number, (3) contact those financial institutions and request loss figures and victim information, and then (4) interview the individual victims to confirm losses and other facts. This process involves querying law enforcement databases, which are not always perfectly accurate in identifying the account-holding bank on the first try. The third step typically requires compulsory legal process like a grand jury subpoena—sometimes more than one. All these steps require intensive agency resources, and the cost to identify each victim would be multiplied by the hundreds (and likely thousands) of individual victims ensnared in the scheme charged in this case.

restitution ordered payable to specified victims in the amount of $619,923.45, restitution to be entered joint and several with Fichidzhyan's co-defendants.

DATED: December 30, 2022          Respectfully submitted,

RANDY GROSSMAN
United States Attorney

*/s/ Nicholas W. Pilchak*
SABRINA L. FÈVE
NICHOLAS W. PILCHAK
Assistant United States Attorneys